**No. 12-2340**

# In the
# United States Court of Appeals
## for the Fourth Circuit

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

v.

KRISTY ROSS, individually, and as officer of
INNOVATIVE MARKETING, INC.,

*Defendant-Appellant.*

and

INNOVATIVE MARKETING, INC. d/b/a Winsolutions FZ-LLC  d/b/a Billingnow d/b/a
Winpayment Consultancy SPC d/b/a BillPlanet PTE Ltd. d/b/a Revenue Response Sunwell d/b/a
Innovative Marketing Ukraine; BYTHEHOSTING INTERNET SERVICES, LLC; JAMES RENO
d/b/a Setupahost.net, individually, and as an officer of Innovative Marketing, Inc., DANIEL
SUNDIN d/b/a Vantage Software d/b/a Winsoftware, Ltd., individually and as an officer of
Innovative Marketing, Inc.; MARC D'SOUZA d/b/a Web Integrated Net Solutions, individually
and as an officer of Innovative Marketing, Inc.; and MAURICE D'SOUZA,

*Defendants.*

Appeal from the United States District Court
for the District of Maryland in Case No. 1:08-cv-03233-RDB.
The Honorable **Richard D. Bennett**, Judge Presiding.

## PAGE PROOF OPENING BRIEF OF DEFENDANT-APPELLANT

Robert P. Greenspoon
William W. Flachsbart
FLACHSBART & GREENSPOON, LLC
333 N. Michigan Avenue, 27th Floor
Chicago, IL 60601
(312) 551-9500

*Attorneys for Defendant-Appellant*
*Kristy Ross*


COUNSEL PRESS · (866) 703-9373     PRINTED ON RECYCLED PAPER 

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  12-2340        Caption:  Federal Trade Commission v. Kristy Ross

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kristy Ross
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                        ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                        ☐ YES ☑ NO
        If yes, identify all such owners:

i

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: /s Robert P. Greenspoon                     Date:    March 5, 2013

Counsel for: Kristy Ross

## CERTIFICATE OF SERVICE
**************************

I certify that on _____March 5, 2013_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Mr. Theodore Metzler
Mr. John F. Daly
Federal Trade Commission
600 Pennsylvania Ave. N.W.
Washington, D.C. 20580

/s Robert P. Greenspoon                          March 5, 2013
        (signature)                                  (date)

# **Table of Contents**

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF CONTENTS.................................................................................. iii

TABLE OF AUTHORITIES .......................................................................... vi

I.      INTRODUCTION ................................................................................ 1

II.     JURISDICTIONAL STATEMENT ..................................................... 2

III.    STATEMENT OF THE ISSUES ......................................................... 2

IV.     STATEMENT OF THE CASE ............................................................ 3

V.      STATEMENT OF FACTS................................................................... 9

        A.      The Computer Security Software Products of Innovative
                Marketing, Inc. ......................................................................... 9

        B.      The Consumer's Overall Buying Experience With IMI
                Products, Including the Three Phrases of a Buying
                Consumer's Interaction. ......................................................... 11

        C.      How Media Buys on the Internet Worked for IMI
                Products .................................................................................. 13

        D.      Kristy Ross's Responsibilities as Media Buyer and the
                Scope of Her Knowledge of Specific Campaigns, All of
                Which Included Initial Popups With the Words "Typical
                Scan" or "Advertisement."...................................................... 16

        E.      Kristy Ross's History With and Role Within IMI, Including
                Her Romantic Relationships With Two of its Three
                Controlling Principals ............................................................ 17

        F.      Kristy Ross's Belief in Legality of IMI's Conduct, Quality
                of IMI's Products, and IMI's Future Prospects as a
                Successful Company ............................................................... 20

G.  Minimal to Nonexistent Evidence of Consumer Injury Evidence at Trial ................................................................. 22

VI.  SUMMARY OF THE ARGUMENT ................................................. 22

VII.  ARGUMENT ................................................................................. 25

A.  Standard of Review ................................................................. 25

B.  The District Court Abused its Discretion in Making Arbitrary and Legally Incorrect Evidentiary Rulings that Assumed "Deceptiveness" Had Already Been Summarily Adjudicated, and in Basing Findings on Inadmissible Hearsay ............................................................. 27

1.  Erroneous Exclusion of Scott Ellis's Testimony ........... 27

2.  Erroneous Admission of "Monetary Remedy" Hearsay Evidence ........................................................ 30

C.  The District Court Committed Legal Error in Applying the Wrong Standards for Individual Liability ................................ 34

D.  The District Court's Factual Findings Were Clearly Erroneous, Even under the Overbroad and Incorrect Legal Standards ........................................................................ 38

1.  Ms. Ross Did Not Control IMI ..................................... 38

2.  Ms. Ross Did Not Participate in Any Deceptive Acts ............................................................................... 43

3.  Ms. Ross Did Not Have Culpable Knowledge ............. 45

E.  The District Court Lacked Jurisdiction to Award Monetary Remedies ................................................................................ 48

1.  Subject Matter Jurisdiction .......................................... 50

2.  The Language of Section 13(b) and its Legislative History Do Not Contemplate Monetary Relief ............. 51

3.  Congress Expressly Permits Monetary Relief in

Section 19(b) under Circumstances Not Alleged to
Exist Here .................................................................... 54

4.  Some Courts Have Erroneously Accepted the FTC's
Section 13(b) Interpretation .......................................... 58

5.  Congressional Inaction Does Not Equate With
Congressional Acquiescence ........................................ 64

VIII.  CONCLUSION ................................................................... 65

Statement Regarding Oral Argument ........................................... 66

Certificate of Compliance With F.R.A.P. 32(a) .......................... 67

Proof of Service ............................................................................ 68

## **Table of Authorities**

**Cases**

*American Bar Ass'n v. Federal Trade Comm'n,*
  430 F.3d 457 (D.C. Cir. 2005) ................................................. 56
*Bilski v. Kappos,*
  130 S. Ct. 3218 (2010) ........................................... 55, 58, 61
*Bourjaily v. United States,*
  483 U.S. 171 (1987) ................................................................ 31
*Bowen v. Georgetown Univ. Hospital,*
  488 U.S. 204 (1988) .......................................................... 48, 53
*Brown & Williamson Tobacco v. FDA,*
  153 F.3d 155 (4th Cir. 1998), *aff'd* 529 U.S. 120 (2000) ................. 35, 64
*Bruesewitz v. WYETH LLC,*
  131 S. Ct. 1068 (2011) ........................................................ 65
*Buckley v. Mukasey,*
  538 F. 3d 306 (4th Cir. 2008) ................................................ 25
*Cooter & Gell v. Hartmarx Corp.,*
  496 U.S. 384 (1990) ............................................................. 25
*Dellastatious v. Williams,*
  242 F.3d 191 (4th Cir. 2001) ................................................. 35
*Evergreen Int'l, S.A. v. Norfolk Dredging Co.,*
  531 F.3d 302 (4th Cir. 2008) ................................................. 26
*Federal Trade Comm'n v. Febre,*
  128 F.3d 530 (7th Cir. 1997) ................................................. 59
*Federal Trade Comm'n v. Gem Merchandising,*
  87 F.3d 466 (11th Cir. 1996) ................................................. 59
*Federal Trade Comm'n v. International Diamond Corporation,*
  Case No. C-82-0878, 1983 U.S. Dist. LEXIS 11862
  (N.D. Cal. 1983) ............................................................. 34, 35
*Federal Trade Comm'n v. John Beck Amazing Profits, LLC,*
  865 F. Supp. 2d 1052 (N.D. Cal. 2012) ...................................... 27
*Federal Trade Comm'n v. Mylan Laboratories, Inc.,*
  62 F.Supp.2d 25 (D.D.C. 1999) ............................................... 59
*Federal Trade Comm'n v. Pantron,*
  33 F.3d 1088 (9th Cir. 1994) ................................................. 59
*Federal Trade Comm'n v. Security Rare Coin,*
  931 F.2d 1312 (8th Cir. 1991) ................................................ 59

*Federal Trade Comm'n v. Singer*,
   668 F.2d 1107 (9th Cir. 1982) .......................................................... 59, 60
*Federal Trade Comm'n v. Southwest Sunsites, Inc.*,
   665 F.2d 711 (5th Cir. 1982) .................................................................. 60
*Federal Trade Comm'n v. Swish Marketing*,
   No. 09-03814, 2010 U.S. Dist. LEXIS 15016 (N.D. Cal.
   Feb. 22, 2010) ........................................................................................ 59
*Federal Trade Comm'n v. Wash. Data Res.*,
   2011 U.S. Dist. LEXIS 72886 (M.D. Fla. 2011) ..................................... 33
*Federal Trade Comm'n v. Weyerhaeuser Co.*,
   665 F.2d 1072 (D.C. Cir. 1981) .............................................................. 57
*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................ 25
*Hager v. Gibson*,
   108 F.3d 35 (4th Cir. 1997) ..................................................................... 50
*Idaho v. Wright*,
   497 U.S. 805 (1990) ................................................................................ 32
*Keene Corp. v. United States*,
   508 U.S. 200 (1993) ................................................................................ 55
*Lamie v. United States Trustee*,
   540 U.S. 526 (2004) ................................................................................ 51
*Marshall v. Gibson's Products*,
   584 F.2d 668 (5th Cir. 1978) ............................................................ 50, 61
*Meghrig v. KFC Western, Inc.*,
   516 U.S. 479 (1996) ................................................................................ 61
*Mitchell v. DeMario Jewelry, Inc.*,
   361 U.S. 288 (1960) ................................................................................ 60
*Murray v. United States*,
   215 F.3d 460 (4th Cir. 2000) ................................................................... 26
*Porter v. Warner Holding Co.*,
   328 U.S. 395 (1946) ................................................................................ 60
*Ragin v. Newburgh Enlarged City School District*,
   2011 U.S. Dist. LEXIS 59728 (S.D.N.Y. 2011) ..................................... 32
*Rehabilitation Ass'n of Va. v. Kozlowski*,
   42 F.3d 1444 (4th Cir. 1994) ................................................................... 65
*Removatron Int'l Corp. v. FTC*,
   884 F.2d 1489 (1st Cir. 1989) ................................................................. 29
*Reyes-Gaona v. North Carolina Growers Ass'n*,
   250 F.3d 861 (4th Cir. 2001) ................................................................... 51

*Schultz v. Butcher*,
   24 F. 3d 626 (4th Cir. 1994) ....................................................... 25
*Schultz v. Capital In'l Sec., Inc.*,
   460 F.3d 595 (4th Cir. 2006) ..................................................... 25
*United States v. Dunford*,
   148 F.3d 385 (4th Cir. 1998) ..................................................... 32
*United States v. Ferguson*,
   653 F.3d 61 (2d Cir. 2011) ........................................................ 33
*United States v. Malloy*,
   558 F.3d 166 (4th Cir. 2009) ..................................................... 25
*United States v. Pearce*,
   191 F.3d 488 (4th Cir. 1999) ..................................................... 25
*United States v. Philip Morris USA, Inc.*,
   396 F.3d 1190 (D.C. Cir. 2005) ........................................... 62, 63
*United States v. Shores*,
   33 F.3d 438 (4th Cir. 1994) ....................................................... 31
*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
   618 F.3d 417 (4th Cir. 2010) ..................................................... 26

## Statutes
15 U.S.C. § 45(a)(1) ...................................................................... 27
15 U.S.C. § 53(b) .................................................................. passim
15 U.S.C. § 57(b) ........................................................... 54, 55, 63
Federal Trade Commission Improvement Act,
   P.L. No. 93-637, 88 Stat. 2201 (1975) ...................................... 52
Trans-Alaska Pipeline Act, P.L. 93-153, 87 Stat. 592 (1973) ..................... 52

## Other Authorities
119 Cong. Rec. 36608 (Nov. 12, 1973) ......................................... 53
A Brief Overview of the Federal Trade Commission's Investigative
   and Law Enforcement Authority" (rev. July 2008), FTC's Office
   of the General Counsel (published by the FTC at
   http://www.ftc.gov/ogc/brfovrvw.shtm, last visited
   Feb. 23, 2013) ........................................................... 49, 50, 53, 59
George P. Roach, *Counter-Restitution for Monetary Remedies
   in Equity*, 68 Wash & Lee L. Rev. 1271 (2011) ....................... 35
H.R. Rep. No. 93-1107 (1974) .................................................... 53

*Proposed Consumer Financial Protection Agency: Implications for Consumers and the Federal Trade Commission Before the Subcomm. on Commerce, Trade, & Consumer Protection of the H. Comm. On Energy & Commerce*, 111th Cong. 13-14 (2009) (statement of Jon Leibowitz, Chairman, Federal Trade Commission) .................................. 56

S. Rep. No. 103-130 (1993) ........................................................ 64

S. Rep. No. 93-151 (1973) .................................................. 52, 54

The Federalist No. 14 (James Madison) (Cambridge University Press, 2003) ............................................................................ 48

## I.    Introduction

The Federal Trade Commission ("FTC") has exceeded its authority in the district courts of this country.  No case exemplifies that better than this one.  Here, the FTC filed, litigated and tried this action under one statutory section (Section 13(b) of the FTC Act), but sought and received remedies that only exist, if at all, under a different statutory section (Section 19 of the FTC Act).  The FTC also urged numerous errors on the district court – the most startling of which was to block all consideration of evidence of nondeceptiveness of the challenged advertising, when this case is a deceptive advertising case.  The FTC convinced the district court that it had already summarily decided the question.  All it had actually done was assume the proposition "*arguendo*" in a pretrial ruling so as to reach (and deny) the FTC's motion for summary judgment on a different issue.

This Court now has the opportunity to reject, as a matter of first impression in this Circuit, standard operating procedures at the FTC that go beyond the limits of its statutory power.  It may also restore fairness to a district court outcome resulting from a type of "due process" more familiar to readers of Kafka, Orwell or Carroll than to observers of the federal court system.  The avalanche of errors at trial warrant this Court reversing or vacating the $163 million judgment on appeal.

## II.    Jurisdictional Statement

The district court had jurisdiction over the FTC's request for forward-looking injunctive relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), a federal question under 28 U.S.C. § 1331.  The Court of Appeals has jurisdiction over this appeal as an appeal from a final judgment under 28 U.S.C. § 1291, entered on September 24, 2012.  The Notice of Appeal was timely filed on October 24, 2012.  Section VII.E below will demonstrate that the FTC had no standing to seek, and the district court had no jurisdiction to award, monetary remedies under Section 13(b), the sole Congressional enactment that the FTC invoked to bring this case.  This Court, like all others, has inherent jurisdiction to determine the scope of its own jurisdiction.

## III.   Statement of the Issues

1.    Did the district court abuse its discretion in an FTC Act Section 13(b) case (i) in excluding evidence rebutting deception of consumers under a mistaken view that it had already granted summary adjudication on the issue, and (ii) in basing findings of individual liability on inadmissible hearsay?

2

2.      Did the district court err in applying incorrect and overbroad legal standards concerning the imposition of Section 13(b) individual liability?

3.      Were the district court's findings of participation, control, and/or knowledge of deceptive acts by others clearly erroneous?

4.      Did the FTC lack standing to seek, and the district court lack power to award, monetary remedies under Section 13(b) – an issue of first impression in this Court?

## IV.    Statement of the Case

The FTC brought this case on December 2, 2008, alleging a scheme to "exploit[] consumers' legitimate concerns about Internet-based threats like spyware and viruses by issuing false security or privacy warnings to consumers for the sole purpose of selling software to fix the imagined problem" (A29, Complaint ¶15).   In other words, the FTC claimed that defendants used deceptive advertising to sell faulty software.    The Complaint alleged a "common enterprise" among several corporate entities, including Innovative Marketing, Inc. (hereafter, "IMI") (A27, Complaint ¶7).   The FTC also named Appellant Kristy Ross, the company's one-time Vice President of Business Development, a media buyer for IMI, as a co-defendant.   The Complaint alleged violations of Section 5(a) (15 U.S.C. §

45(a)), and asserted the FTC's power as a federal agency to bring a court action solely under Section 13(b) of the FTC Act (15 U.S.C. § 53(b)) (A25, Complaint ¶1). However, despite the preconditions and requirements for bringing a court action, the FTC had not commenced an administrative complaint within the FTC that might lead to a cease-and-desist order under Section 5(b) (15 U.S.C. § 45(b)).

On December 12, 2008, the district court granted preliminary injunctive relief (A2). Motion practice ensued, and the district court refused to dismiss the action (A5-12). Appellant Kristy Ross filed her answer on June 23, 2009 (A11).

Meanwhile, in parallel with this action, the Justice Department indicted several of the co-defendants, including Sam Jain, Daniel Sundin (IMI's controlling officers) and James Reno (n.3, A1179). The Justice Department has not said whether it has or will indict Ms. Ross (such an indictment hypothetically might exist under seal), although it did once indicate such an intention (A1345-46). At present, Ms. Ross remains the only IMI former officer not subject to a public indictment.

In this civil case, and in the shadow of the indictments of her co-workers, several persons and entities defaulted (A12). In default proceedings, the FTC used two sources to calculate alleged monetary

remedies for alleged "consumer injury": (1) a Quickbooks spreadsheet summary created in prior Canadian litigation for litigation purposes (used by the FTC to represent gross IMI receipts during the years 2004 through 2006), and (2) information from a credit card processing company called "Jettis" (used by the FTC to represent gross receipts collected for co-defendant Sundin during the years 2007 through 2008) (A196-99, A211-15, A1799). The FTC presented a default award calculation of approximately $163 million, representing alleged gross IMI receipts for 2004 through 2008 (A199). No one appeared to challenge the calculation, and the district court entered default judgments on February 24, 2009. Judgment was not entered against Appellant Ross, who by then had appeared to defend and clear her name (A216-27). Eventually, all co-defendants who had not defaulted settled with the FTC, except for Appellant Ross (A5-12, A1178). Ms. Ross remained as the sole party to defend against the FTC allegations (A1178).

Discovery commenced. By then, the FTC was able to use materials seized by the FBI to build its case, including the entire multi-gigabyte computer nerve center of IMI, which had been maintained in Ohio by co-defendant James Reno (the IT manager of IMI) (A1237-38). Ms. Ross participated in discovery from overseas, having been advised by counsel of her constitutional rights (A2450-52). Ms. Ross had no documents to provide

5

(A2450-54), but did submit to deposition questioning (A2447-91). Her counsel advised her not to answer many questions, and she duly invoked her rights under the Fifth Amendment.

The FTC moved for summary judgment against Ms. Ross (A269-353). The district court denied the FTC's motion and set the matter for trial (A911-23). Within the summary judgment memorandum opinion, the district court expressly did not issue any findings by summary adjudication of whether or not the actions of IMI were "deceptive" and violated Section 5(b) (A911-23). It instead assumed "*arguendo*" that such violations did occur, in order to reach the subsidiary questions regarding Ms. Ross's individual liability (A917). Upon reaching those questions, the district court found that genuine issues of material fact precluded summary judgment for the FTC (A917-23).

In preparing for trial, Ms. Ross made the Court aware that she intended to call as an expert witness Scott Ellis, who had duly submitted his expert reports and had been deposed (A970-75). Through his analysis of materials seized by the FBI, Mr. Ellis had direct knowledge of (1) the non-deceptiveness of the overall net impression of many of the advertisements in question, and (2) the adequate functioning of the underlying computer software products (A354-83, 595-602). Mr. Ellis's testimony, therefore,

went directly to the heart of the FTC's theory of liability. The district court, on the eve of trial, required Ms. Ross to submit a motion *in limine* to justify the admissibility of Mr. Ellis's proffered testimony (A20). Ms. Ross's motion explained that Mr. Ellis expert testimony was critical to the question of her knowledge of and participation in what the FTC had alleged to be deceptive advertising (A970-75). Even though the district court had never issued or considered any Rule 37 discovery sanctions, and even though Mr. Ellis's qualifications to be an expert witness under FRE 702 were never in question, the district court excluded Mr. Ellis from trial (A1100-04). The district court justified this ruling by stating that it had already decided the question of deceptiveness, even though its prior ruling indicated that it had merely assumed deceptiveness without deciding it (A1103).

The district court made other evidentiary rulings against Ms. Ross. Ms. Ross moved *in limine* to exclude numerous proposed FTC exhibits that were either (1) Canadian litigation affidavits that she had *not* adopted as admissions, or (2) exhibits to Canadian litigation affidavits for which the FTC submitted no "business records exception" or "summary compilation" showings (not even via deposition testimony) (A606-27, A1054-61, A-1114-25). The district court denied Ms. Ross's motion by finding that the challenged documents fell within the residual exception under FRE 807

7

(A1054-61, A1172, A1181, A1167-71). In addition, during trial, the district court admitted over Ms. Ross's objection a hearsay email authored by Mr. Sundin that served as the FTC's only "evidence" that Ms. Ross remained an IMI officer in 2007 and 2008 (A132-15, A2183).

A two-day bench trial commenced on September 11, 2012. As a consequence of prior court rulings, Ms. Ross was precluded from presenting evidence of non-deceptiveness, and was confronted almost entirely with FTC documentary hearsay evidence that she could not cross examine and that no live FTC witness would sponsor or explain (A1218-1461). The district court correctly declined the FTC's request for an adverse inference from Ms. Ross's invocation of her constitutional rights (A1166-71). But in later criticizing Ms. Ross for defending the case "*in absentia*" in its written ruling, and in taking counsel to task during closing arguments for Ms. Ross's absence, the district court apparently disregarded its own ruling (A1182, A1408-10).[1] In the end, only a single witness testified live, a witness who had never met or spoken to Ms. Ross. Testimony took up only eighteen of the 242 pages of trial transcript, mostly to authenticate a document for the

---

[1] The district court also criticized Ms. Ross in its findings and conclusions for not presenting an alternative monetary-remedy calculation. The district court thus forgot that Ms. Ross indicated she would call damages expert James Langenfeld to testify, but was not permitted to do so.

FTC (A1290-1307).  Most of the trial consisted of opening statements and closing arguments (*i.e.*, the other 224 pages) (A1218-89, A1308-1461).

Twelve days later, on September 24, 2012, the district court issued its memorandum opinion and judgment, meeting its stated goal of concluding this case in advance of a self-imposed September 30 deadline that no party had asked for (thus keeping the case off the "pending three years" list) (A1460).  The opinion contained the district court's findings of fact and conclusions of law.  In its opinion, the district court found Ms. Ross liable for the same $163 million in monetary remedies as in the default judgments, and issued a permanent injunction against her involvement in computer security software (A1201-05).  The FTC immediately issued a press release boasting of the $163 million judgment. *See* Press Release, Federal Trade Commission, FTC Case Results in $163 Million Judgment against "Scareware" Marketer (Oct. 2, 2012) (Published by the FTC at http://www.ftc.gov/opa/2012/10/winfixer.shtm, last visited Feb. 24, 2013) (Reproduced at A003660).  This appeal followed.

## V.    Statement of Facts

### A.    The Computer Security Software Products of Innovative Marketing, Inc.

As established by the FTC's own investigator, IMI sold numerous computer security software applications (A4044-47).  The FTC identified

over 130 distinct brands and versions (A4044-47). The FTC connected exactly six of these applications to Ms. Ross and her responsibilities within IMI (A4044-47, A1419-20) (in trial arguments, counting "System Doctor" and "SystemDoctor" on A4046 as two, to reach sum of seven products). These six named software applications connectable to Ms. Ross were:

> Winfixer
>
> ErrorProtector
>
> WinAntivirus
>
> DriveCleaner
>
> ErrorSafe
>
> SystemDoctor

(A4044-47). Ms. Ross's job was to buy advertising space for these products.

In discovery, the FTC focused on a fraction of the advertising experience used to sell such products, and all but ignored what the products actually did for consumers. Mr. Ellis, in his expert report later used in Ms. Ross's offer of proof, considered and analyzed certain executable files contained in the FTC's evidence and was able to capture, monitor and then opine upon what the for-sale products did (A363-69). Of the six applications over which Ms. Ross had media buying responsibilities, Mr. Ellis was able to locate and investigate four (the same four analyzed by the

FTC's expert): DriveCleaner, ErrorPatrol, WinAntivirus and Winfixer (A363-69).

After testing and running such programs, Mr. Ellis concluded that they performed adequately (A363-69). In particular, they correctly cleaned files from test computers that were not necessary for the computer's functioning and had the potential of creating vulnerabilities in the users' computers (*e.g.*, files populating the "registry" that had no purpose), and correctly located and removed test viruses that Mr. Ellis had placed onto his test machines (A363-69). It was undisputed that these commercial software products did, in fact, scan users' computers (A363-69). The result of the scan determined what corrective measures the software would take (A363-69). The FTC never successfully challenged the fact that IMI products had at least some value to consumers.

**B.    The Consumer's Overall Buying Experience With IMI Products, Including the Three Phases of a Buying Consumer's Interaction.**

The FTC focused its entire "deceptiveness" case on just a part of the consumer experience leading up to a software purchase – the initial-contact popup, banner or landing-page advertisement. The FTC denigrated such initial-contact advertisements as a "scareware scam" (A1223). However, the only possible "injured" consumers were ones who actually purchased the

software, and did not get their money refunded. The FTC's monetary remedy theories could not have included consumers who merely saw an annoying popup ad and decided to make no purchases.

Focusing on *purchasing* consumers, IMI's promotional efforts would have included more than just the initial-contact advertisement. Mr. Ellis described in his expert report, and he was prepared to testify, that there were also free promotional applications that could be downloaded (A363-69, A596-98). First, a consumer would see the initial-contact advertisement (*i.e.*, the ads around which the FTC built its "deceptiveness" case). Second, if the consumer responded by clicking, the consumer would be brought to a "landing page" on the Internet and given an opt-in chance to download a free promotional version of the software in question (A363-69, A596-98). Mr. Ellis confirmed, from various executable files from the FBI-seized cache of IMI computer files, that the free promotional version of Winfixer contained a scanner that scanned the consumer's computer (A596-98). The result of the scan would be presented to the consumer, to allow a fully informed purchase decision to take place (A596-98, "The number listed here, 138, does accurately reflect the number of problems found by the software scanner. This list is not a fabrication and the software identifies what it perceives to be problems."). Finally, by this point, consumers with the

scanning results in hand who wished to purchase the software would do so, for example by clicking "Repair" and registering their software (A597).

In its case in chief, the FTC touted that Kristy Ross's six-product responsibility for media-buys with MyGeek (an Internet advertising network also referred to in the record as AdOn) resulted in over 600 million initial-contact advertisements showing up on consumer computers (A292-398, A727, A1005, A1189, A1361, A1365). The FTC did not, however, mention to the district court that purchasing-consumers were only a tiny fraction of these placements, and that in every case such consumers would have had a fully-informative free promotional computer scan before purchasing the product.

## C. How Media Buys On the Internet Worked for IMI Products.

Evidence at trial also demonstrated how disconnected Ms. Ross was from the initial-contact advertisements upon which the FTC focused its case. Employees at IMI frequently communicated through online chats memorialized in logs seized by the FBI. Throughout two million lines of IMI chat logs, the FTC focused on only four instances where Ms. Ross was consulted on the exact content of an initial-contact advertisement (known in the business as a "creative") (A1303, A3532 (discussing blinking of lights on a popup), A2388 (referring the ad to someone else to correct grammar

13

into American English), A2387 (discussing Ms. Ross's preference for changing lingerie-wearing women to bikini-wearing women to eliminate sexual undertones), and A2409-10 (discussing possible removal of the word "advertisement" from a banner)).[2]  In each of these instances, the context reveals that Ms. Ross did not create the ad.  And in none of these four instances did the FTC place into evidence (1) what the final version of the initial-contact advertisement looked like, (2) that Ms. Ross knew what the final version looked like, (3) whether it ever ran at all, or (4) whether Ms. Ross had any control over its ultimate dissemination.  In contrast, Ms. Ross presented chat log excerpts that demonstrated that others in the company were responsible for the content of the initial-contact advertisements (A3579) (showing that "Mike" and "Leo75" had authored the ad in question).

As a media buyer, Ms. Ross would not necessarily have had any responsibility over what the initial-contact creatives contained (A2540, A2542-43, A2559-61).  As a media buyer, Ms. Ross interacted with MyGeek by (1) establishing accounts for campaigns, and (2) supplying

---

[2] Once within the two million lines of the chat log, Ms. Ross requests more "aggression" for an ad – an excerpt that the FTC highlighted extensively (A3578, A3583, A3585, A333-34).  The actual content of this ad is not in the record.  "Aggression" often referred to something other than content, such as "parameters" that could be tested and "exit pops" that would recur (A3583, A3682, A3827).

MyGeek with URL's for the campaigns (simple text strings that begin with "http://" and end with an Internet server address) (A2542-43, A2559-61). Others within IMI developed the landing pages and creatives that such URL's linked to (A2542-43). Ms. Ross was often delayed in responding to MyGeek's request for URL's, and often had to wait for others at IMI to finish their work for her to hand them off (A2539-40, A2546, A2554). Ms. Ross's MyGeek contact was Geoff Gieron. Mr. Gieron or a member of his team would review every single URL to determine if the linked-advertisement satisfied MyGeek's policies (A2541-43, 2554). Ms. Ross received some complaints when Mr. Gieron told her that the ad at the link was doing things it was not supposed to do (*e.g.*, popups that would re-appear when the computer user tried to close them) (A2703-2706). But there were no MyGeek complaints of "deceptiveness," and Mr. Gieron approved the content of every ad for which Ms. Ross ever gave him URL links (A2542-43, 2554). The sole witness at trial, a different MyGeek employee who had no familiarity with any of Ms. Ross's advertising with that company, confirmed that MyGeek would not have presented or approved of any objectionable ads (A1304).

### D. Kristy Ross's Responsibilities as Media Buyer and the Scope of Her Knowledge of Specific Campaigns, All of Which Included Initial Popups with the Words "Typical Scan" or "Advertisement."

The evidence at trial showed that Ms. Ross set up fifty-four MyGeek accounts (A2573-2626). She used her own credit card for account setup (A2571-72, A2535). As soon as each account's usage exceeded a payment threshold (usually around $500), another company official's credit card would be used to pay for further placements (A2535-37). By the end of the MyGeek relationship, a cumulative total of about $20,000 had been charged against Ms. Ross's own credit cards, and charges to the other company officials' credit accounts (such as Marc D'Souza's and Daniel Sundin's) had exceeded $3.3 million (A3551-54, A411).

Of the six specific IMI product names whose MyGeek advertising campaigns the FTC's evidence linked to Ms. Ross, the record only contains screen shots of the initial-contact advertisements for three of them: Winfixer (A3680-3700, A3701-09, A3720-33, A3734-36, A3737-38, A3935-38, 4068-69, A3939-41, A3944-46, A3947-52), Winantivirus (3739-3145, A3747-55, A3758-81, A3837-39, A3958-62, A3976-82, A3983-4004), and Drivecleaner (A3791-3821, A1605).[3] In each campaign, while the initial-

---

[3] For DriveCleaner and Winantivirus, another company employee – Conrad Raphael – also placed IMI ads, with different ad networks (A4014-18,

contact advertisements themselves did mention having found a certain number of errors or dangerous files on the user's computer, the record contains screenshots of language stating that the scan was a "typical system scan," and/or was an "advertisement" (A3720-33, A3734-36, A3837-39, A3939-41, A3944-46).[4]     Mr. Gieron testified that he did not understand these advertisements as representing that they were scanning a consumer's computer, but rather, as indicated, that they showed what a "typical" scan would look like (A3542, A3569, A2548-49).

> **E.** **Kristy Ross's History with and Role within IMI, Including Her Romantic Relationships with Two of its Three Controlling Principals.**

Since the district court focused on Ms. Ross's connections with the true control group at IMI, some discussion of that is helpful.  In 2002, Ms. Ross was 22 years old and dating Sam Jain (A3002-04).  Ms. Ross introduced Mr. Jain to her friend, Daniel Sundin (A3002).  After Mr. Jain and Mr. Sundin met, Mr. Sundin decided to form IMI as its sole shareholder in 2002, as a Belize corporation (A1597).  Eventually Mr. Jain became its

---

A4019-26) and so the record is unclear whether these ads were placed by Ms. Ross or by Mr. Raphael.

[4] For one of the DriveCleaner initial contact advertisements, the record showed one instance with the word "advertisement," and another without (A3791-3821, A1605).  However, the record also showed that such advertisements were made using "Flash," and operated by changing still frames like a motion picture (A3598, A3600, A376, A2684).  As such, the record is not definitive with respect to whether the word appeared or not.

chief executive (A1741). Mr. Jain hired Mr. D'Souza to assist with administration and payment processing (A1743-44). In an expense report document that the FTC relied on heavily at trial (and which the district court admitted over Ms. Ross's hearsay objection), Messrs. Jain, Sundin and D'Souza show up as the persons who approved the vast majority of expenses, frequently ones that Ms. Ross requested (A2283-2317). In contrast, of the 8.3% of reported company expenses shown to be approved by Ms. Ross, fully 8.1% out of that 8.3% related to her function as a mere media buyer, *e.g.*, approval of "Affiliate Payment SWP" (A2283-2317).[5]

The district court's findings and conclusions rely heavily on Ms. Ross's one-time title of Vice President of Business Development (A1187). However, this title did not endow her with any control over operations. IMI was a 660-employee global company (A1255). The FTC's own investigator concluded that IMI did not use formal titles in any conventional sense (A3014-15). At trial the FTC relied on chat log excerpts where Ms. Ross got angry with subordinates (A2319, A2321, A2331-32, A2346, A2349-51).

---

[5] These percentages are discernible from the trial record as follows: Of 2,639 entries on the FTC's expense exhibit, 219 were "approved by" Ms. Ross (A2283-2317). Of these, 213 had "purposes/remarks" and/or the "description" associated with media-buying categories, such as "Affiliate Payment SWP" and "Webmoney Exchange" (A2283-2317). The rest (only 6) stated either "payroll expenses" or "translation services" (A2283-2317).

The FTC also relied on statements from the Canadian litigation that Ms. Ross at one time stepped in to check Mr. Sundin's email when he was ill and unable to perform his role as Chief Technology Officer (A1600). But absent from the FTC's case was any instance where Ms. Ross showed any capacity to countermand an order issued by Messrs. Jain, Sundin or D'Souza, or reverse any company policies they set. While the FTC did show that Ms. Ross was consulted about a "Mobile AV" project proposed by "Sunny" (Sundin) (A2325), also absent from the FTC's case was any instance where Ms. Ross herself directed company policies, or chose any corporate course of action.

Finally, the district court relied heavily on Ms. Ross's participation as an affiant in the Canadian litigation,[6] and on hearsay statements (over Ms. Ross's objections) interpreted to mean that Ms. Ross received a share of IMI profits. The district court overlooked evidence in the trial record that, by the time of the Canadian litigation, Ms. Ross was now in a romantic relationship with Mr. D'Souza (A2432). It was already of record that others "owned" IMI (A1742, A1597). Thus the stated desire of others to share profits with Ms. Ross was a complex interpersonal matter fully explainable by Ms.

---

[6] In 2006-2007, Jain and Sundin, on one hand, and D'Souza, on the other, litigated in Canada over their respective shares of IMI upon dissolution. Ms. Ross was not a party to that litigation.

Ross's 2002 relationship with Mr. Jain (A3004), and 2006-2007 relationship with Mr. D'Souza (A2432), each of whom was in the process of battling the other over possession of IMI funds (A1630-60, A1692-1727, A1737-84, A1785-1801, A1802-1943). Likewise, Ms. Ross's participation as an affiant in the Canadian litigation was not because of any controlling interest in IMI, but because she was a percipient witness to things that Mr. D'Souza had said that undermined his claims against the interests of Messrs. Jain and Sundin (A2431-33). At no time did Ms. Ross participate in the Canadian litigation either as plaintiff or defendant, nor was she a signatory to the resolution of that litigation (A1589, A1596, A1615, A1634, A1665, A1696, A1732, A1741, A1789, A1806, A3504-25).

### F. Kristy Ross's Belief in Legality of IMI's Conduct, Quality of IMI's Products, and IMI's Future Prospects as a Successful Company.

The FTC's claim of individual liability for monetary remedies put at issue Ms. Ross's alleged knowledge of IMI's allegedly deceptive practices. The district court's findings and conclusions, however, overlooked direct evidence rebutting the possibility of any such knowledge.

First in a 2006 chat log excerpt between Ms. Ross and Mr. Reno, Ms. Ross (whose handle is "fuzzy") reflects on the future positive outlook of the company (A3528-29, A3534-36). In the process, in addition to disclaiming

knowledge of who owns IMI, she comments that venture firms are studying IMI for investment (A3534-36). She notes to Mr. Reno her awareness that IMI's popup ads are sometimes "unpleasant," but notes with earnestness that they are not illegal (A3534). It was beyond dispute that Ms. Ross and Mr. Reno had no awareness that their "chat" would ever be anything other than private, much less evidence in a future court proceeding.

Second, while the FTC relied on Ms. Ross's awareness of so-called "complaints" from Mr. Gieron and MyGeek, the FTC never presented any evidence that any consumer, website publisher or ad network complained to her of *deceptiveness* of any IMI advertisements or practices. Instead, the context of the complaints filtered through MyGeek was clear (A2548-49). MyGeek fielded complaints that the popup ads were persistent (they would reappear after consumers tried to close them) which was against network policy, and that some popups would generate "autodownloads" against network policy (A2557-59). The context shows Ms. Ross's surprise at both of these issues, and that she diligently tried to solve the problem with others in her company (A3680-3700, A3701-09, A3737-38, A3782-87, A3788-90, A3791-3821, A3822-25, A3871-76, A3885-95, A3907, A3913-14, A3916-34, A3947-52, A3963-64, A3983-4004).

## G.    Minimal to Nonexistent Evidence of Consumer Injury Evidence at Trial.

While the district court attributed joint and several liability to Ms. Ross for what it believed to be all company receipts for computer security products from 2004 through 2008, the evidence did not link such "consumer injury" to Ms. Ross.    Instead, the FTC entered only seven consumer affidavits into the trial record that mention product names or versions over which Ms. Ross was shown to have some responsibilities (A3555-65).  Four of these on their face demonstrate that the consumer did not purchase the product (A3558, A3566, A3562, A3564).  One shows that the consumer did make a purchase but then received a refund (A3555).  At most, the two that remain show that a consumer paid for the product and did not obtain a refund – a record that in the wildest stretch would justify "consumer redress" calculations well below $163, let alone $163 million (A3556, A3557).

## VI.    Summary of the Argument

The FTC and the district court marched Kristy Ross, a media buyer and business development vice president, to a show trial in Wonderland. Once through the Looking Glass, issues never decided suddenly became law of the case, and presumed omniscience served as a convenient substitute for evidence of scienter.  Although it had never so held, on the eve of trial the district court decided that whether the conduct of IMI was deceptive was not

22

an issue for trial and the sole issue instead was whether Ms. Ross could be held liable for that conduct. The FTC urged the district court to impose upon Ms. Ross $163 million of individual liability, jointly and severally with her employer-company, to redress consumer injury arising from advertising campaigns whose sole alleged "deceptiveness" never touched on the characteristics or qualities of the computer software products actually being sold.

The FTC succeeded in blocking from the trial record the overall consumer experience with the advertising campaigns as a whole, focusing all judicial attention solely on initial-contact ads. While no one, including Ms. Ross herself (A3534), ever denied that popups were annoying and even "unpleasant," the district court suppressed consideration of the most important evidence. It blinded itself to what each and every purchasing consumer would see next, *after* seeing the annoying popup ads but *before* making a purchasing decision. Ms. Ross's offer of proof that she was prevented from introducing at trial showed that the overall net impact of the promotion as a whole was nondeceptive, and should have led to a finding that the FTC did not meet its burden.

Though the trial record only showed Ms. Ross's awareness of ad campaigns for less than 5% of the company's products (other media buyers

also placed ads), the district court found that Ms. Ross "controlled" the entire company and "directly participated" in all of its allegedly deceptive conduct. In doing so, the district court misapplied statutory common law "control" standards that had drifted and broadened beyond their origins in a 1983 Northern District of California case. Legal error pervaded this holding because nothing in the FTC Act suggests that an individual may be held liable for all of its company's consumer injury in the absence of proof of authority over specific conduct, actual awareness that the conduct is happening, and actual awareness that the conduct is deceptive. Even if it stated the law correctly, the district court's factual findings ignored trial evidence that should have led to findings that Ms. Ross had no control over the company, no participation in most of its ad campaigns, and no knowledge of deceptiveness (constructive or actual).

Were that not enough, this case presents nearly every issue as one of first impression in the Fourth Circuit. The FTC rarely brings actions in the district courts of this Circuit. Now that it has, its self-granted agency power is up for full scrutiny under the relevant Congressional enactments. The very consideration of monetary remedies was *ultra vires* FTC authority. All monetary remedies were beyond the subject matter jurisdiction of the district court. That is because, while Section 19 of the FTC Act might permit

monetary remedies after administrative action that the FTC chose to forego here, the FTC brought and litigated this case solely under Section 13(b).

## VII.  Argument

### A.    Standard of Review

This Court reviews a lower court's decision to exclude or admit evidence for abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997).  A district court abuses its discretion when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises. *United States v. Malloy*, 558 F.3d 166, 177 (4th Cir. 2009).  An error of law by a district court is by definition an abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *United States v. Pearce*, 191 F.3d 488, 492 (4th Cir. 1999).  The court's evidentiary ruling, even if it constitutes an abuse of discretion, "is reversible only if it affects a party's substantial rights." *Schultz v. Capital In'l Sec., Inc.*, 460 F.3d 595, 606-07 (4th Cir. 2006) (citing Fed. R. Civ. P. 103(a)).  Substantial rights are affected if the incorrect exclusion or admission renders the affected party unable to cogently demonstrate a material element of the defense. *Buckley v. Mukasey*, 538 F.3d 306, 320 (4th Cir. 2008); *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) (holding erroneous exclusion of evidence at bench

25

trial not harmless "since a party was prevented from fully developing evidence relevant to a material issue").

This Court employs a "mixed standard of review" when judgment results from a bench trial. *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 427 (4th Cir. 2010) (citation and quotation marks omitted). The Court reviews the district court's legal rulings de novo. *Id.*; *see also Murray v. United States*, 215 F.3d 460, 463 (4th Cir. 2000) (legal conclusions regarding the correct standard of proof for proximate cause are reviewed de novo). The Court reviews the district court's factual determinations for clear error. *Universal Furniture Int'l, Inc.*, 618 F.3d at 427. Under clear error review, a finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court considering all the evidence is "left with a definite and firm conviction that a mistake has been committed." *Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 308 (4th Cir. 2008).

**B.    The District Court Abused its Discretion in Making Arbitrary and Legally Incorrect Evidentiary Rulings that Assumed "Deceptiveness" Had Already Been Summarily Adjudicated, and in Basing Findings on Inadmissible Hearsay.**

The district court abused its discretion in excluding evidence material to the absence of Section 5 liability, and admitting evidence material to the imposition of monetary remedies on Ms. Ross.

**1.    Erroneous Exclusion of Scott Ellis's Testimony.**

Section 5 of the FTC Act prohibits "unfair methods of competition in or affecting commerce[] and unfair or deceptive acts or practices in or affecting commerce. . . ." 15 U.S.C. § 45(a)(1).  An act is deceptive if (1) there is a representation, omission or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission or practice is material. *Federal Trade Comm'n v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1066 (N.D. Cal. 2012).  To assess factor (2), whether a representation is likely to mislead, a court should consider the "overall net impression" conveyed by the representation. *Id.*  To assess factor (3), whether a representation is material, a court should consider if it is likely to affect consumer choice or conduct regarding a product. *Id.* at 1067.

27

Here, on June 11, 2012, the district court affirmatively and expressly told the parties that the issue of deceptiveness remained for trial. In denying the FTC's motion for summary judgment, the district court stated, "this Court will assume *arguendo* that FTC Act violations did indeed occur and will concentrate on the parties' arguments pertaining to Ross' involvement with Innovative Marketing" (A917). Assuming the truth of a matter *arguendo* is not a ruling. The district court went on to find the presence of genuine issues of material fact concerning Ms. Ross's involvement with IMI and denied summary judgment (A918-23).

Consequently, nothing justified the district court's August 28, 2012, ruling excluding Mr. Ellis. There, the Court stated, "this Court has concluded that Innovative Marketing was engaged in deceptive advertising. If Ross had the requisite control at the company, and had sufficient knowledge of the deceptive acts, then she may be held jointly and severally liable [citation omitted]. Mr. Ellis' conclusion that some advertisements were not deceptive is, quite simply, of no import to the Court" (A1103).

This "no import to the Court" reasoning – a shocking and quixotic ruling that the information lacked relevance – was both arbitrary and legally incorrect. By its very definition, evidence tending to show nondeceptiveness is relevant and admissible in an FTC Act deceptive advertising case. Here,

the evidence showed that the overall net impression of the advertising was not likely to mislead – consumers were fully informed of their computer's status after execution of the free promotion software that every purchasing consumer would see *after* viewing a popup and *before* making a purchase (A363-69, A595-602). The evidence also showed that any alleged deceptiveness arising from the initial-contact popup ads was immaterial – consumer choice in consummating an actual purchase would not have been affected by a popup ad once the free promotional software executed to provide full information to the consumer. *See, e.g., Removatron Int'l Corp. v. Federal Trade Comm'n*, 884 F.2d 1489, 1497 (1st Cir. 1989) (suggesting that disclaimers and qualifications may avoid liability if sufficiently prominent and unambiguous to change the apparent meaning of prior claims and to leave accurate impression). At a minimum, the excluded evidence was relevant to showing that the advertisements linkable to Ms. Ross's responsibilities were nondeceptive (*see* A363-69). This is so even if the district court harbored unspoken beliefs that certain ads beyond Ms. Ross's purview demonstrated partial IMI corporate liability under Section 5.

The exclusion of evidence was not harmless. It manifestly precluded Ms. Ross from making a full presentation of her defense. She labored at trial to refute individual liability without being allowed to refute the net

29

overall deceptiveness of any advertising campaigns linked to her responsibilities.  Because of the district court's abuse of discretion, at a minimum this Court should vacate the judgment and order a new trial on liability.

## 2.    Erroneous Admission of "Monetary Remedy" Hearsay Evidence.

The district court also abused its discretion in admitting certain items of FTC evidence, all of which related to calculation of the "monetary remedy."  By the time of trial, the district court had made it clear that it would only relieve Ms. Ross of part of IMI's $163 million default judgment liability if Ms. Ross could show that she was not a "control" person for parts of the 2004-2008 period (A1101-02).  The only alleged evidence that Ms. Ross remained a "vice president" in the 2007-2008 time period was a 2008 email from Daniel Sundin to Jettis, the payment processor, listing Skype numbers for a group of people.  That email purports to give Ms. Ross's Skype number, labeling her a "Vice President" (A2183).  During trial, Ms. Ross objected on hearsay grounds to the admission of this evidence (A1313-15).  The district court overruled the objection under FRE 801(d)(2)(E) (statements of co-conspirators) (A1315).  However, nothing in the trial record supported a required factor that the FTC would have to prove by a preponderance that the statement was made in furtherance of a conspiracy.

This Court has observed that *Bourjaily v. United States*, 483 U.S. 171, 181 (1987), left open the question of whether a court may use *only* the hearsay statement itself as a "bootstrap" for proof of the existence of a conspiracy at a certain time. *United States v. Shores*, 33 F.3d 438, 443 n.4 (4th Cir. 1994). This Court's prior rulings that one may not bootstrap the hearsay in question to prove a conspiracy remains the law of this Circuit. *Id.* Here, the sole evidence that Ms. Ross was a "vice president" (and thus had some "control") during the bulk of the 2007-2008 period is the 2008 email itself. It cannot be used to "bootstrap" its own admissibility. The error affected Ms. Ross's substantial rights, since the district court used Ms. Ross's alleged officer status in 2007-2008 to tag her with all of the 2007-2008 monetary remedies – all of which the FTC calculated solely using Jettis payment processing information (A933-34).

Finally, all remaining monetary remedy "calculations" – those attributed to 2004-2006 – were also based on inadmissible hearsay, although for different reasons. The 2004-2006 hearsay also was entered by the district court over Ms. Ross's objections. In this situation, however, Ms. Ross moved to exclude the material *in limine* before trial (A1054-61, A1114-25). The material comprised litigation-purpose financial summaries described in a Canadian affidavit as a Quickbooks printout (A1790, A1799).

The litigants in the underlying Canadian litigation debated the reliability of the very printout itself (A1735, A1711, A1715, A1716, A1717, A1720, A1721), and its authenticity was not subject to cross examination in any proceeding. Nor did the FTC ever call any witness with personal knowledge to sponsor the printout as either authentic, a business record, or a proper summary under FRE 1006.

Notwithstanding its status as hearsay, the district court admitted it under FRE 807 (the residual exception) (A1167-71). But as this Court has emphasized, the residual hearsay exception "is a narrow exception that should not be construed broadly." *United States v. Dunford*, 148 F.3d 385, 394 (4th Cir. 1998). The FTC could not show the required "circumstantial guarantees of trustworthiness" because admitting such affidavits (or their attachments) under the residual exception "would abrogate the requirement in Rule 804(b)(1) that a party against whom prior sworn testimony is offered must have had an opportunity for cross-examination." *Ragin v. Newburgh Enlarged City School District*, 2011 U.S. Dist. LEXIS 59728, at *7 (S.D.N.Y. 2011); *see also Idaho v. Wright*, 497 U.S. 805, 820, 823 (1990) (forbidding "bootstrapping on the trustworthiness of other evidence at trial" to show the declarant's trustworthiness, instead requiring inquiry into whether the circumstances make "the declarant's truthfulness [] so clear . . .

that the test of cross-examination would be of marginal utility. . . ."); *United States v. Ferguson*, 653 F.3d 61, 88 (2d Cir. 2011) (uncross-examined affidavits not trustworthy); *Federal Trade Comm'n v. Wash. Data Res.*, 2011 U.S. Dist. LEXIS 72886 (M.D. Fla. 2011) (same).[7]

Erroneous admission of the Quickbooks summary (A196-99, A1799) affected Ms. Ross's substantial rights. This questionable summary was the only evidence on which the district court relied to calculate the 2004-2006 window of alleged "monetary remedies" (A1204). As a result, in combination with the other errors, the district court erroneously entered the entire 2004-2008 period "monetary remedy" calculation baseline into evidence. Because of this abuse of discretion, and because no baseline monetary remedy evidence remains upon which to build a corrected calculation, the Court should vacate and remand for entry of a nominal monetary remedy award (if such a remedy exists, see Section VII.E. below).

---

[7] By the same reasoning, the district court erroneously admitted all affidavits and attached exhibits offered by the FTC of Marc D'Souza from the Canadian litigation (A1630-60, A1661-91, A1692-1727, A1728-36). That ruling, too, was not harmless, since the FTC at trial continuously cited to Mr. D'Souza's affidavits to bolster its arguments that Ms. Ross had some level of "control" at IMI (AA1228-29, A1440-41). The district court, however, ignored that the Canadian court had stricken at least one D'Souza's affidavit and sanctioned Mr. D'Souza, presumably for its inaccuracies.

**C.    The District Court Committed Legal Error In Applying the Wrong Standards for Individual Liability.**

This Court has never ruled on the standards for individual liability under Section 13(b) of the FTC Act.  As a matter of first impression, the Court is free to consult original sources of Congressional intent.  The language of Section 13(b) itself reveals this intent.  That language permits entry of a permanent injunction against deceptive acts, when the situation warrants. 15 U.S.C. § 53(b).  Invocation of such equitable powers only makes sense when asserted against individuals who can actually do (or refrain from doing) a misdeed.  There is no need to enjoin the proverbial janitor.  Likewise, if an individual is to be held jointly and severally liable for company-wide violations, then the individual's power to do something about company-wide problems must exist, or else due process concerns will arise.

That is why this Court should employ the standards announced in *Federal Trade Comm'n v. International Diamond Corporation*, Case No. C-82-0878, 1983 U.S. Dist. LEXIS 11862, at *13-*14 (N.D. Cal. Nov. 8, 1983).  In *International Diamond*, the district court reviewed the purpose of the then-recent amendments to the FTC Act, and reviewed Securities and Exchange Commission cases, to divine Congressional intent concerning individual liability.  That court concluded:

> The relevant principle is that one may not enjoy the benefits of fraudulent activity and then insulate oneself from liability by contending that one did not participate directly in the fraudulent practices.  It is enough that one participated in the operation of the business or otherwise was aware of the apparent fraud *and failed to act within one's authority to control those practices*.

*Id.* (emphasis added).  Therefore, this Court should adopt the following explicit standards for individual FTC Act liability, after corporate liability is found: (1) authority to control the specific practices alleged to be deceptive, and (2) failure to act within such control authority while aware of apparent fraud.  District courts should be required "to examine what the defendants could have done under the circumstances to prevent the violation, and then ask whether the defendants – aware that they could take such measures – decided not to." *Dellastatious v. Williams*, 242 F.3d 191, 194 (4th Cir. 2001).

Here, the FTC succeeded in convincing the district court to explicitly reject Fourth Circuit individual liability standards (A1194 n.12).[8]    It

---

[8] This Court has observed that "government agencies have a tendency to swell, not shrink, and are likely to have an expansive view of their mission." *Brown & Williamson Tobacco v. FDA*, 153 F.3d 155, 162 (4th Cir. 1998), *aff'd* 529 U.S. 120 (2000) (citation omitted).  The federal court system has been unusually tolerant of the FTC's expanding mandate, based in part on "weak research" and "sympathy" for its mission. George P. Roach, *Counter-Restitution for Monetary Remedies in Equity*, 68 Wash & Lee L. Rev. 1271, 1309 (2011).  The FTC achieved its court successes by becoming an "expert plaintiff or prosecutor in a litigation process that is foreign to many lawyers. . . .  The confusing vocabulary and obscure legal doctrine suggest a

therefore erred as a matter of law in its determinations. The district court stated that individual liability turns on mere "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer," coupled with a state of mind that the individual merely "should have known" of the deceptive acts (A1197). Such standards are too low, and worse, unclear. They allow "control" to be shown by indicia having more to do with enthusiasm for and skill at one's job than with authority over specific ad campaigns, and allow fault to be shown without any actual awareness of coworkers' misdeeds.

Here, Ms. Ross would not have been held individually liable if the district court had applied the correct legal standards.

First, even assuming that initial-contact ads were deceptive, no evidence supported that Ms. Ross had authority to control them, particularly outside of her role as a MyGeek media buyer. The FTC presented no evidence that Ms. Ross originally authored any such ads, or issued any instructions that they be created. The FTC showed four instances over the course of six years where Ms. Ross responded to requests for assistance

---

long learning curve and the opportunity for experienced 'prosecutors' to 'push' defense counsel and the bench." *Id.* at 1314. Section VII.E will demonstrate that this strategy has led district courts to believe incorrectly that Section 13(b) allows monetary remedies.

from the ad-creators (A2388, A1303, A3532, A2387, A2408, A2409-10). Critically, not only was there zero evidence about the final content of these ads, there was no evidence whatsoever that any of these ads ever actually ran, that Ms. Ross had authority to reject proposed ads such as these, or that any consumer ever made a purchase after seeing them.

Second, all of the trial evidence pointed to only one conclusion on "control" – that some combination of Sam Jain, Daniel Sundin and Marc D'Souza were the individuals with controlling authority. The FTC's own trial evidence showed that while nearly every expense approval by Ms. Ross occurred solely within her role as a media buyer, nearly every other expense of any significance in the company was approved by one of those three individuals (A2283-2317). In fact, Ms. Ross's own expense requests, in almost every case, had to be approved by one of those three (A2283-2317).

Even within Ms. Ross's media buying role, the evidence showed that all she could do was start accounts (not continue to fund them), and deliver URL text strings given to her by unspecified others, representing imagery authored and stored on unspecified Internet servers by unnamed persons (A2540, A2542-43, A2559-61). Ms. Ross worked diligently in those instances when MyGeek complained that discrete ads violated MyGeek's policies (A2548-49, A2557-59, A3680-3700, A3701-09, A3737-38, A3782-

87, A3788-90, A3791-3821, A3822-25, A3871-76, A3885-95, A3907, A3913-14, A3616-34, A3947-52).  In those cases, Ms. Ross had to consult others to fix the problem, and get back to her MyGeek contact, Mr. Gieron (A2548-49, A2557-59, A3680-3700, A3701-09, A3737-38, A3782-87, A3788-90, A3791-3821, A3822-25, A3871-76, A3885-95, A3907, A3913-14, A3616-34, A3947-52).  Since no FTC evidence indicated true "control" under the proper legal standards, the district court's individual liability judgment should be reversed.

## D. The District Court's Factual Findings Were Clearly Erroneous, Even under the Overbroad and Incorrect Legal Standards.

Even under the legal standards applied by the district court, the judgment rested on clearly erroneous "control" and "direct participation" fact-finding.  It also rested on clearly erroneous findings of constructive or actual knowledge of deceptiveness.  Therefore, regardless of any legal errors, the judgment should be reversed.

### 1. Ms. Ross Did Not Control IMI.

The district court relied on the following factors to find that Ms. Ross "controlled" IMI (all findings in the record at A1195):

- Being an "original founder of the company and [being] known by all three of the other main officers of the company as someone who would receive and who received shares of the profits;"

- Receiving D'Souza's 2006 termination letter along with Jain and Sundin;

- Identifying herself as IMI's Vice President of Business Development, and stating that she was responsible for business expansion, sales and marketing, and product optimization;

- Being one of seven people to approve expenses; and

- Being "one of the main individuals to appear in a managerial role in chat logs, emails and advertising contracts."

The "control" conclusion was erroneous because the evidence revealed the following explanations for each of the above-noted "factors":

- Ms. Ross was not a "founder," because Sundin was instead, having formed IMI as its sole shareholder in 2002 (A1597). Instead, Ms. Ross introduced Sundin and Jain, the latter becoming the chief executive (A1597, A1741). Any "shares of the profits" came in the context of Ms. Ross being Jain's girlfriend, and later D'Souza's, not because of any ownership or managerial role she might have played (A3002-4, A2432);

- D'Souza copied Ms. Ross on his December 29, 2006, termination letter at a time when they had an intimate relationship. Ms. Ross's inclusion in the letter was because of the personal relationship, not because of any controlling company role (AA2432, A2255-57);

- Having duties related to expansion, sales, marketing and optimization does not suggest any "control" of company affairs in a context where Sundin and Jain are the undisputed leaders of the company (A2251);

- Expense approvals were almost entirely within Ms. Ross's role as a media buyer, not reflective of general authority over company affairs, and her expense approvals paled in comparison to the others' (A2283-2317); and

- Being "in a managerial role" at most indicates mid-level duties and responsibilities, and a staff to support them; it does not indicate control of affairs company-wide, and certainly did not in the specific instances cited at trial (A3527-29, A3530-32, A3533, A3537, A3538, A3539, A3540, A3541, A3543, A3547-48).   In addition, only a fraction of extant chat logs entered the record, and the FTC entered no statistical analyses of the logs that might support that Ms. Ross was a "main" individual overall.

The totality of the evidence, including facts ignored by the district court, further demonstrates Ms. Ross's lack of control. Facts ignored by the district court include:

- Sundin and Jain's Canadian affidavits never mention Ms. Ross as a control person, and do not mention consulting her when they decided how to build IMI as a business, but instead mention themselves and D'Souza (A1592-1610, A1611-29, A1737-84, A1785-1801);

- Ms. Ross never made a capital contribution and never held stock, as did those in control at IMI (A1592-1610, A1611-29, A1737-84, A1785-1801);

- Ms. Ross took no money out of IMI, as did those in control at IMI (A1592-1610, A1611-29, A1737-84, A1785-1801);

- Sundin and Jain added D'Souza as a partner without Ms. Ross's involvement or consultation, including deciding on terms for D'Souza's compensation without her (A1598, A1743-45);

- Sundin and Jain indicate that all departments report to them, not Ms. Ross (A1599, A1759);

- Ms. Ross was not a true corporate officer, as the FTC's investigator confirmed that IMI did not adhere to corporate formalities (A3014-15);

- Ms. Ross was not a party to the Canadian litigation, whereas Sundin, Jain and D'Souza each were (A1589, A1596, A1615, A1634, A1645, A1696, A1732, A1741, A1789, A1806, A3504-25);

- IMI had over 660 employees, precluding IMI from being considered a small closely held corporation (A1255);

- No evidence existed showing Ms. Ross' control over IMI domain names since those instead linked to Sundin (A2981-85, A2986, A3043-52, A3056-75);

- No evidence existed showing Ms. Ross's control over bank account or wire information, since those instead linked to Sundin (A2986, 2988-91, A3257, A3263-74); and

- No evidence linked Ms. Ross's Maryland home address to IMI websites, billing pages, customer service or bank accounts (A2981-85, A2986, A3043-52, A3056-75, A2986, A2988-91, A3257, A3263-74).

In sum, all indicia of corporate control pointed to Jain, Sundin and D'Souza, but not Ms. Ross.  The district court clearly erred to find otherwise.

### 2.    Ms. Ross Did Not Participate In Any Deceptive Acts.

The district court alternatively relied on the following factors to find that Ms. Ross "directly participated" in all of IMI's "deceptive" acts (all findings in the record at A1196-97):

- Interacting with staff and developers to control the content and appearance of ads, and reprimanding departments when the work did not meet her standards;

- Having reputed marketing expertise;

- Being consulted in partnership agreements, how to reorganize the company, and whom to hire;

- Having access to company accounts to approve corporate expenses; and

- Opening $23,000 worth of MyGeek accounts using her own credit cards, out of $3.3 million of IMI funds ultimately spent.

All of these factors omit specific linkage to specific IMI advertisements, except the final factor of Ms. Ross's media buying at MyGeek.  With regard to that final factor, the district court clearly erred in

finding any direct participation in deceptive acts because of the following overlooked facts:

- The record contains screenshots of language in MyGeek-placed ads related to initial-contact campaigns that either stated the ad showed a "typical system scan," or was an "advertisement" – a clear disclaimer precluding consumer reliance or materiality (A3720-73, A3734-36, A3737-38, A3837-39, A3939-41, A3944-46, A1605); and

- According to Ms. Ross's offer of proof, all software purchases prompted by any MyGeek-placed ads would have included a free software download that fully informed the consumer of files that actually should be removed from the consumer's computer before the consumer decided to purchase the product (A363-369, A596-98).

In sum, all ads that arguably involved Ms. Ross's direct participation involved no consumer deception. The district court clearly erred to find otherwise.

### 3.    Ms. Ross Did Not Have Culpable Knowledge.

Finally, the district court relied on the following factors to find that Ms. Ross had culpable "knowledge" (all findings in the record at A1199-1201):

- She "wrote, edited, reviewed and participated in the development of multiple advertisements;"

- She "instructed developers to make the advertisements more aggressive and on at least two occasions ordered them to remove the term 'advertisement' from certain ads;"

- She "funded the accounts;"

- She "was fully aware of the many complaints from consumers and ad networks and was in charge of remedying the problems;"

- She "had marketing expertise and was trusted," at one time was romantically involved with Jain and D'Souza, and at one time had access to Sundin's email;

- she "knew the complaints concerned the fact that the advertisements purported to scan but that the ads themselves were not supposed to scan" and knew the ads were "unpleasant" and that "customer retention was low;" and

- "MyGeek terminated the relationship with IMI by informing her that her advertisements were threatening MyGeek's reputation."

On the contrary, the "knowledge" conclusion was erroneous because the evidence revealed the following explanations for each of the above-noted "factors":

- No evidence shows her "writing" any ad, only FTC fascination with four instances over six years of her being consulted over drafts created by others that no evidence links to an actual IMI initial-contact ad (A2308, A2387, A2408, A2409-10);

- "Aggression" in context could have meant nothing about content, and removal of the word "advertisement" is of no moment if the ad was inherently nondeceptive (A363-69, A596-98, A3720-33, A3734-36, A3737-38, A3837-39, A3939-41, A3944-46) – plus, the FTC introduced no imagery related to these cited instances;

- Funding of accounts may occur without awareness of creative content of the ads (A2573-2626, A2571-72, 2535);

- The only "complaints" reverting to Ms. Ross related to matters other than content of the ads – persistence and auto downloads in violation of MyGeek policy, not that the ads were deceptive (A2703-06, A2543, A2554);

- Marketing expertise, romantic involvements, and email access are not probative of knowledge of specific ads;

- "Unpleasantness" was due to the annoying nature of popups, not deceptive content, and no evidence suggested she believed nonscanning ads purported to scan (A3606-09); and

- MyGeek did not single out IMI, but terminated all security software advertising relationships after receipt of a subpoena from Microsoft, from a desire not to antagonize such a giant (A2558, A2873-74).

The totality of the evidence, including facts ignored by the district court, further demonstrates Ms. Ross's lack of knowledge. Facts ignored by the district court include:

- The evidence demonstrated that other IMI employees made all of the advertising creatives, not Ms. Ross (A2542-43);

- Ms. Ross only supplied URL strings (*i.e.*, links to ads, not the ads themselves) in her role with MyGeek, and often had to wait for others in the company to prepare them (A2539-40, A2546, A2554);

- Such URL strings functioned by calling ads stored by others on servers within IMI, not Ms. Ross (A2530, A2540); and

- Ms. Ross believed the company's products were sound, that its practices were not illegal, and that it had a bright future (A3606-09).

In sum, Ms. Ross had no knowledge, either actual or constructive, that any specific IMI ads or ad campaigns were deceptive.  The district court clearly erred to find otherwise.

### E.    The District Court Lacked Jurisdiction to Award Monetary Remedies.

As discussed below, all monetary remedies should be vacated as beyond the FTC's standing to seek under Section 13(b) of the FTC Act.  It is an elementary principle of administrative law that agencies have only the power that Congress grants them. *See, e.g., Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power . . . is limited to the authority delegated by Congress.").[9] Yet in the 40 years since its Congressional enactment, the FTC has transformed Section 13(b) from an injunctive tool into a powerful weapon for monetary remedies and business settlement extractions, contrary to the specific intent of Congress.

Section 13(b) of the FTC Act is specific as to what relief it empowers federal courts to grant.  Courts may issue *temporary restraining orders*,

---

[9] In the Federalist No. 14, James Madison wrote of the limited government and enumerated powers implied under our Constitution: "In the first place it is to be remembered that the general [federal] government is not to be charged with the whole power of making and administering laws. Its jurisdiction is limited to certain enumerated objects . . . ." The Federalist No. 14, at 61 (James Madison) (Cambridge University Press, 2003).

*preliminary injunctions*, or *permanent injunctions* in such cases where the FTC believes that a party is *violating* or *about to violate* any provision of the Act. 15 U.S.C. § 53(b). It is impossible to find any reference to granting *monetary* remedies, because it simply does not exist. Section 13(b) was intended (and can only be read) as a stopgap measure to immediately freeze the ongoing harmful actions of the defendant.

The FTC has admitted that Section 13(b) was intended by Congress to provide interim injunctive relief pending the outcome of an administrative adjudicatory action. Its own General Counsel stated that at the time of its Congressional enactment, "the provision was expected to be used principally for obtaining preliminary injunctions against corporate acquisitions, pending completion of FTC administrative hearings." *See* "A Brief Overview of the Federal Trade Commission's Investigative and Law Enforcement Authority" (rev. July 2008), FTC's Office of the General Counsel (published by the FTC at http://www.ftc.gov/ogc/brfovrvw.shtm, last visited Feb. 23, 2013) (reproduced at A003634-41, hereafter "Brief Overview"). It was not until the 1980s that the FTC decided to sidestep the administrative process altogether and shoehorn monetary remedies into the clear injunctive-only wording of Section 13(b). Again, the FTC admits that "in the 1980s . . . the Commission argued that the statutory reference to 'permanent injunction'

49

entitled the Commission to obtain . . . various kinds of monetary equitable relief to remedy past violations."  (Brief Overview, A003637).

While the FTC has indeed successfully convinced other courts to read Section 13(b) in this manner, the issue is a matter of first impression here, endowing this Court with the unique opportunity to cabin the FTC to actions that actually have a basis in Congressional enactments.

### 1.    Subject Matter Jurisdiction.

An appellate court must dismiss a claim if subject matter jurisdiction is lacking, even if the issue only first becomes apparent on appeal. *See, e.g., Marshall v. Gibson's Products*, 584 F.2d 668, 672 (5th Cir. 1978); *see also Hager v. Gibson*, 108 F.3d 35, 38 (4th Cir. 1997) (An appellate court's "review of subject matter jurisdiction is plenary") (internal citations omitted).  Furthermore, courts do not typically read grants of jurisdiction into statutory language when not so expressly stated. *Marshall*, 584 F.2d at 676 ("Where Congress does not *intend* to grant jurisdiction, we will not infer it, for Congress has plenary power over the jurisdiction of the federal district courts") (emphasis added).  As shown below, Congress solely and explicitly provided for monetary remedies in Section 19(b), which Section the FTC did not raise, and could not have raised, in this case.

2.    **The Language of Section 13(b) and its Legislative History Do Not Contemplate Monetary Relief.**

The plain text of Section 13(b) is clear, and provides only for the granting of injunctive relief. The heading of Section 13(b) is "temporary restraining orders; preliminary injunctions." 15 U.S.C. § 53(b). Section 13(b) uses precise wording: "a *temporary restraining order* or a *preliminary injunction* may be granted without bond," and "[in] proper cases the Commission may seek, and after proper proof, the court may issue, a *permanent injunction*." 15 U.S.C. § 53(b) (emphasis added). The fact that Congress elected to expressly enumerate the types of relief available precludes the reading in of monetary remedies. *See, e.g.*, *Reyes-Gaona v. North Carolina Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001) ("[T]he doctrine of *expressio unius est exclusio alterius* instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded"); *see also Lamie v. United States Trustee*, 540 U.S. 526, 537 (2004) ("courts should not add an 'absent word' to a statute;" "there is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.").

Even if the intent of Section 13(b) were not clear from its plain text, the legislative history provides ample evidence of its purpose as a stopgap

51

measure.  Congress added Section 13(b) to the FTC Act as part of the Trans-Alaska Oil Pipeline Authorization Act of 1973. P.L. No. 93-153, 87 Stat. 592 (1973).  This section was added primarily as a band-aid, allowing the FTC to enjoin defendants' deceptive practices during the pendency of an administrative proceeding.  Prior to this, a defendant could continue to injure consumers until an ultimate judgment in its case.

The legislative history confirms the limited purpose of this amendment.  A Senate Report addressing what was to become Section 13(b) stated:

> The purpose of [Section 13(b)] is to permit the Commission to bring an *immediate halt to unfair or deceptive acts or practices when to do so would be in the public interest*. At the present time such practices might continue for several years until agency action is completed. Victimization of American consumers should not be so shielded. [Section 13(b)] authorizes the granting of a temporary restraining order or a preliminary injunction without bond pending the issuance of a complaint by the Commission under Section 5 . . . .

S. Rep. No. 93-151, at 30-31 (1973) (Emphasis added).[10]  In the House discussion on Section 13(b), Representative Smith noted that "[i]t is only good sense that where there is a probability that the act will eventually be found illegal and the perpetrator ordered to cease, that some method be

---

[10] Although Section 13(b) was passed as part of the Trans-Alaska Pipeline Authorization Act in 1973, it was originally introduced as part of and was discussed in the legislative history of the Federal Trade Commission Improvement Act. P.L. No. 93-637, 88 Stat. 2201 (1975).

available to protect innocent third parties while the litigation winds its way through final decision." 119 Cong. Rec. 36608-9 (Nov. 12, 1973). Furthermore, a 1974 House Report, written just after passage of Section 13(b), set out the purpose of the amendment:

> Both the Nader and ABA reports recommended that the FTC be empowered to obtain preliminary injunctions against unfair or deceptive acts or practices which are unfair or deceptive to consumers. This authority was granted by Section 408 of the Alaska Pipeline Act [Section 13(b)] . . . .

H.R. Rep. No. 93-1107, at 7716 (1974). Nowhere in the original legislative history does any elected official even contemplate Section 13(b) being used for the purpose of obtaining consumer redress. The FTC, as noted above, on its own accord decided to read this interpretation into the statute. (Brief Overview, A003637). This is a bold admission of improper administrative aggrandizement. While the FTC's purpose may have been to seek a more expedient means of remedying consumer harm, it is nevertheless bound to follow the clearly stated law that Congress passed. *See, e.g., Bowen*, 488 U.S. at 208. In this instance, Section 13(b) limits the agency to seeking purely injunctive relief.

### 3. Congress Expressly Permits Monetary Relief in Section 19(b) Under Circumstances Not Alleged to Exist Here.

In 1975, only two years after the passage of Section 13(b), Congress amended the FTC Act to include Section 19(b).[11]  This Section permits the FTC to bring civil actions against parties only *after* it has gone through the administrative process and issued a final cease-and-desist letter. 15 U.S.C. § 57(b).   While the relief granted in Section 13(b) cases is limited to injunctions, Section 19(b) explicitly *includes* monetary relief:

> The court in an action under subsection (a) of this section shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief *may include, but shall not be limited to*, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be . . . .

15 U.S.C. § 57(b) (emphasis added).   The difference in wording between Sections 13(b) and 19(b) is clear.   Section 13(b) lays out an exhaustive list

---

[11] Both Sections 13(b) and 19(b) were originally introduced during the same session of Congress. *See* S. Rep. No. 93-151, at 27-31 (Origins of Section 19(b) introduced as "Consumer Redress (section 203)," and origins of Section 13(b) introduced as "Injunctions (section 210)").   Section 19(b) was passed in 1975 as part of the Federal Trade Commission Improvement Act. P.L. No. 93-637, 88 Stat. 2183 (1975).   However, the fact that both Sections were originally contemplated together provides additional evidence that Sections 13(b) and 19(b) were meant to address separate issues.

limiting relief to temporary restraining orders, preliminary injunctions, and permanent injunctions. 15 U.S.C. § 53(b). Section 19(b), in contrast, provides a *non-exhaustive* list ("such relief *may include, but shall not be limited to*") that *explicitly* permits the FTC to seek monetary relief. 15 U.S.C. § 57(b). The Supreme Court has noted that "where Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (*quoting Russello v. United States*, 464 U.S. 16, 23 (1983)). Congress passed Section 19(b) to grant the FTC powers which it did not previously have. To assume otherwise would be to accuse Congress of passing a redundant amendment after two years of legislative deliberation. *See, e.g., Bilski v. Kappos*, 130 S. Ct. 3218, 3228-29 (2010) (explaining the statutory canon that courts should not "interpret[] any statutory provision in a manner that would render another provision superfluous," even when "Congress enacted the provisions at different times") (internal citations omitted).

Again, the FTC has indirectly admitted through its own statements that Section 19(b), rather than Section 13(b), is the statutory text in the FTC Act that permits the agency to request monetary remedies from the judiciary.

55

*Proposed Consumer Financial Protection Agency: Implications for Consumers and the Federal Trade Commission Before the Subcomm. on Commerce, Trade, & Consumer Protection of the H. Comm. On Energy & Commerce*, 111th Cong. 13-14 (2009) (statement of Jon Leibowitz, Chairman, Federal Trade Commission) (Published by the FTC at http://www.ftc.gov/os/2009/07/090708Acfpatestimony.pdf, last visited Feb. 19, 2013) (reproduced at A3642-59, hereafter "Chairman Statement"). In a prepared statement to Congress in which the FTC Chairman explained that the Commission has the power to obtain monetary remedies, including consumer redress and disgorgement of ill-gotten gains, the Chairman cited *only* to Section 19(b). Chairman Statement at A3645-46. To bring a Section 19(b) action, the FTC must pursue administrative action first. It has not done so in this case – either by way of rulemaking, or obtaining a cease-and-desist order.

Agencies should not read authority into statutes where none exists. "[I]f we were to '*presume* a delegation of power' from the absence of 'an express *withholding* of such power, agencies would enjoy virtually limitless hegemony . . . .'" *American Bar Ass'n v. Federal Trade Comm'n*, 430 F.3d 457, 468 (D.C. Cir. 2005) (quoting *Ry. Labor Exec. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 571 (D.C. Cir. 1994)) (en banc) (emphasis in original).

Congress carefully designed two distinct powers for the FTC – first utilizing the court's injunctive power under 13(b) to halt ongoing consumer harm, and second, only seeking monetary remedies under 19(b) for consumer redress after an administrative process has prohibited the specific conduct in question.

The FTC will argue in this case that the remedies of Section 13(b), rather than straitjacketed by precise wording, are intended to provide any and all of the court's "inherent equity powers." Yet it was the FTC itself that argued the opposite in the early 1980s, before beginning its quest to legitimize its expansion of power. In *Federal Trade Comm'n v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981), the FTC argued against the district court issuing a hold separate order to block a merger rather than a complete preliminary injunction, and the appellate court thus characterized its argument: "[Section] 13(b) authorizes a preliminary injunction blocking a merger *in toto*, but no relief short of a full restraint. A less drastic measure, such as a hold separate order, *does not bear congressional approval* . . . and can be justified, if at all, only as an exercise of the court's 'inherent equity powers.'" (emphasis added). While that court ruled that Congress intended Section 13(b) to be read in light of the flexibility of the "historic injunctive process," which crafts remedies

according to the case at hand, it still limited such flexibility to injunctive relief. *Id.* at 1084 ("A hold separate order is in form and effect a preliminary restraint, albeit less drastic than a full stop order") (citing *Hecht Co. v. Bowles,* 321 U.S. 321, 329 (1944)).

Ms. Ross by no means argues that the FTC is without power to seek injunctions under Section 13(b). However, Congress has prescribed a specific procedure for granting monetary remedies, and that procedure is plainly laid out in Section 19(b). To read monetary remedies into the language of Section 13(b), especially in light of complementary Section 19(b), would be to permit the FTC to expand its authority beyond the express command of Congress, enable the FTC to circumvent the Act's requirement that it exhaust administrative remedies before seeking monetary remedies, and would render Section 19(b) a nullity. *See Bilski*, 130 S. Ct. at 3228-39.

### 4. Some Courts Have Erroneously Accepted the FTC's Section 13(b) Interpretation.

Bringing a Section 13(b) complaint under the FTC's proposed reading permits a more powerful set of tools for the FTC to extract settlements and default judgments from businesses and individuals. Rather than filing two actions – one for injunctive relief, and the second for consumer redress after a final cease-and-desist order – the FTC's interpretation allows the FTC to

seek both forms of relief at once. In fact, according to the FTC, "most consumer protection enforcement is now conducted directly in court under Section 13(b), rather than by means of administrative adjudication . . . [because] the court may award both prohibitory and monetary equitable relief in one step." (Brief Overview, A3637). Yet while the FTC claims that "the courts have uniformly accepted the Commission's construction of Section 13(b)" (Brief Overview, A3637), the Fourth Circuit has not yet addressed this issue.[12]

The first appellate decision to infer ancillary relief (such as rescission of contracts and restitution) into the clear wording of Section 13(b) was *Federal Trade Comm'n v. Singer*, 668 F.2d 1107 (9th Cir. 1982). That court

---

[12] According to *Federal Trade Comm'n v. Mylan Laboratories, Inc.*, 62 F.Supp.2d 25, 37 (D.D.C. 1999), five circuits have permitted the FTC to seek monetary relief under 13(b). *See Federal Trade Comm'n v. Febre,* 128 F.3d 530, 534 (7th Cir. 1997); *Federal Trade Comm'n v. Gem Merchandising*, 87 F.3d 466, 470 (11th Cir. 1996); *Federal Trade Comm'n v. Pantron*, 33 F.3d 1088, 1102 (9th Cir. 1994); *Federal Trade Comm'n v. Security Rare Coin*, 931 F.2d 1312 (8th Cir. 1991); *Federal Trade Comm'n v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982). The defendant in *Federal Trade Comm'n v. Swish Marketing,* a case in the Northern District of California, made largely the same argument as presented here. *See* Defendant's Motion to Strike, *Federal Trade Comm'n v. Swish Marketing*, No. 09-3814 (N.D. Cal. Dec. 2, 2009), ECF No. 34. While the judge in that case recognized the merit of defendants' argument, he was bound by Ninth Circuit precedent to rule in favor of the FTC. *Federal Trade Comm'n v. Swish Marketing*, No. 09-03814, 2010 U.S. Dist. LEXIS 15016, at *2-3 (N.D. Cal. Feb. 22, 2010). This Court has no such controlling precedent to limit its judicial freedom.

found that "unless otherwise provided by statute, all the inherent equitable powers of the District court are available for the proper and complete exercise of that jurisdiction." 668 F.2d at 1112 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)). It further found that "unless a statute in so many words, or by a necessary and inescapable reference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Id.* (quoting *Porter*, 328 U.S. at 398). Because Section 19(b) stated that its remedies were in addition to, and not in lieu of, any other remedy provided under the FTC Act, *Singer* held that it could not be inferred that Congress had explicitly acted to restrict the full scope of equitable remedies in Section 13(b). *Id.* at 1113. Both *Singer* and most subsequent cases affirming ancillary relief relied on *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), and *Mitchell v. DeMario Jewelry, Inc.*, 361 U.S. 288 (1960), for the proposition that "although the plain language of the statute speaks only of enjoining an allegedly unlawful act or practice, virtually identical statutes permitting other agencies to seek preliminary injunctions have been interpreted as invoking the full equitable jurisdiction of the district court." *Federal Trade Comm'n v. Southwest Sunsites, Inc.,* 665 F.2d 711, 717-18 (5th Cir. 1982).

Notwithstanding *Porter* and *Mitchell*, this Court should not construe Section 13(b) so broadly, especially given the legislative history cited above. Congress made an express grant of power to seek monetary remedies in Section 19(b) – Section 13(b)'s sister provision. The unavoidable logical result of the FTC's interpretation renders Section 19(b) superfluous. *See Bilski*, 130 S. Ct. at 3228-29. By comparison, in *Marshall*, the Court refused to infer that Congress provided for injunctive relief in Section 8(a) of the Occupational Safety and Health Act when Congress *explicitly* provided for federal subject matter jurisdiction elsewhere in the statute. 584 F.2d at 673-74. In addition, the Supreme Court in *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 487-88 (1996), stated that where "Congress has provided 'elaborate enforcement provisions' for remedying the violation of a federal statute . . . it cannot be assumed that Congress intended to authorize by implication additional judicial remedies . . . ."[13]

In accord with the Supreme Court's pronouncements in *Meghrig*, Sections 13(b) and 19(b) work in concert to provide such elaborate enforcement provisions. They clearly designate the specific types of relief

---

[13] The Supreme Court went so far as to state that "it is an elementary canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Meghrig*, 516 U.S. at 488 (quoting *TransAmerica Mortgage Advisors, Inc., v. Lewis*, 444 U.S. 11, 19 (1979)).

granted under each, and the specific set of facts that must exist in order to grant such relief.  Congress did not pass each provision ignorant of the other.

The Court of Appeals for the D.C. Circuit has also recently recognized the limits of inferring judicial equitable power.  In *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1192 (D.C. Cir. 2005), the court found that the equitable remedy of disgorgement went above and beyond the equitable relief provided by the Racketeer Influenced and Corrupt Organizations Act.  The court acknowledged the command of *Porter* granting courts a wide equitable berth, but was careful to read the wording of the federal statute so as not to run astray of Congressional intent. *Id.* at 1197.  Stating that courts may only "assume broad equitable powers when the statutory or Constitutional grant of power is equally broad," the court noted that the relief-granting statutory language in *Porter* was broad (the court was permitted to grant "a permanent injunction, restraining order, *or other order*" when deciding what relief to grant under the Emergency Price Control Act). *Id.* at 1198 (emphasis added).  Because "other order[s]" were permitted, the court found in that case it was "not a stretch" to read broad equitable relief into what the statute permitted. *Id.*

The language in *Porter* differs materially from the language in *Philip Morris*, and here.  Nowhere in Section 13(b) does the statutory wording

permit "other orders," or "other relief."  In fact, the equitable relief granted is specifically enumerated, and only includes "temporary restraining orders," "preliminary injunctions," and "permanent injunctions." 15 U.S.C. § 53(b). In contrast, Section 19(b) tracks the language of the statute in *Porter*, in that it expressly provides that the enumerated remedies "shall include, *but shall not be limited to*," specific types of monetary relief. 15 U.S.C. § 57(b).  In addition, the court in *Philip Morris* engaged the canons of *noscitur a sociis* and *eijusdem generis* to find that a list of explicit remedies in a statute should only be expanded, if at all, "with remedies similar in nature to those enumerated." 396 F.3d at 1200.  Stating that the remedies explicitly provided in the statute were all directed at future conduct, the court found that disgorgement, which is meant to remedy *past harm*, could not properly be inferred as an additional equitable remedy. *Id.*

The parallels to Section 13(b) are striking.  As has been stated both in the legislative history and by courts alike (including the *Singer* court, which nonetheless expanded the scope of Section 13(b)'s equitable relief to include monetary relief), the purpose of Section 13(b) is to maintain the status quo, a *forward-looking* remedy. In contrast, consumer redress is backward-looking relief intended to remedy *past* consumer harm.

**5.    Congressional Inaction Does Not Equate with Congressional Acquiescence.**

Appellant acknowledges that Congress has taken no action since Section 13(b)'s passage to restrict the FTC's misuse of Section 13(b). Appellant further acknowledges a 1993 Senate Report regarding the amendment of the FTC Act (dealing with changes to venue and service of process, both perpendicular to the substance of Section 13(b)), in which the Senate said of Section 13: "The FTC can go into court ex parte to obtain an order freezing assets, and is also able to obtain consumer redress." S. Rep. No. 103-130, at 15-16 (1993).  While the Supreme Court has noted that in some cases Congressional inaction in the face of repeated and salient agency action may be seen as legislative ratification of the agency's statutory interpretation, this Court has noted that this is the exception rather than the rule, and courts should be "reluct[ant] . . . to rely on congressional inaction as a basis of statutory interpretation." *Brown & Williamson Tobacco*, 153 F.3d 155 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 632 (1993); *Bob Jones Univ. v. United States*, 461 U.S. 574, 601 (1983)) (internal citations omitted).  One reference in a Senate Report regarding an amendment that has nothing to do with the enforcement purposes of Section 13(b) should not be an indication that Congress is well aware of and approves of Section 13(b) being used in a way anathema to its purpose. *Cf. Bruesewitz v.*

*WYETH LLC*, 131 S. Ct. 1068, 1081-82 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation" as it "by definition could have had no effect on the congressional vote") (internal citations and quotations omitted); *Rehabilitation Ass'n of Va. v. Kozlowski*, 42 F.3d 1444, 1457 (4th Cir. 1994) (Stating the "pitfalls of relying on post-enactment legislative history, which Justice Scalia recently has characterized, quite appropriately, as an oxymoron") (internal citations and quotations omitted).

For the reasons stated above, this Court should hold that the FTC lacks Congressional authority to seek, and that courts lack subject-matter jurisdiction to grant, monetary relief under Section 13(b).

## VIII.  Conclusion

For the foregoing reasons, the Court should order a new trial on all issues (*see* Section VII.B.1), vacate the judgment and direct entry of a new judgment with no monetary remedies (*see* Sections VII.B.2 and VII.E), and/or reverse the judgment entirely (*see* Sections VII.C and VII.D).

/s Robert P. Greenspoon
*Counsel of Record*
Robert P. Greenspoon
William W. Flachsbart
rpg@fg-law.com
wwf@fg-law.com
Flachsbart & Greenspoon, LLC
333 N. Michigan Ave., 27th FL

Chicago, IL 60601
(312) 551-9500
Attorney for Defendant-
Appellant Kristy Ross

March 5, 2013


## Statement Regarding Oral Argument

The appellant requests oral argument.

## <u>Certificate of Compliance with F.R.A.P. 32(a)</u>

Appellant's Opening Brief complies with the type-volume limitation of F.R.A.P. 32(a)(7)(B) because this brief contains 13,857 words, excluding the parts of the brief exempted by F.R.A.P. 32(a)(7)(B)(iiii). This brief complies with the typeface requirements of F.R.A.P. 32(a)(5) and the type style requirements of F.R.A.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman and 14-point font.

/s Robert P. Greenspoon
*Counsel of Record*
Robert P. Greenspoon
William W. Flachsbart
rpg@fg-law.com
wwf@fg-law.com
Flachsbart & Greenspoon, LLC
333 N. Michigan Ave., 27th FL
Chicago, IL 60601
(312) 551-9500
Attorney for Defendant-
Appellant Kristy Ross

March 5, 2013

## **Proof of Service**

I hereby certify that on March 5, 2013, Appellant's Page-Proof Principal Brief was filed with the United States Court of Appeals for the Fourth Court *via* ECF in accordance with Local Rule 25, which will send notice of this filing to the following registered CM/ECF users:

John F. Daly
Theodore (Jack) Metzler
FEDERAL TRADE COMMISSION
Room H-582
600 Pennsylvania Avenue, NW
Washington, DC 20580-0000
Email: jdaly@ftc.gov

/s Robert P. Greenspoon
*Counsel of Record*
Robert P. Greenspoon
William W. Flachsbart
rpg@fg-law.com
wwf@fg-law.com
Flachsbart & Greenspoon, LLC
333 N. Michigan Ave., 27th FL
Chicago, IL 60601
(312) 551-9500